## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARLO L. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:16-cv-01557 |
| v. | ) | |
| | ) | |
| BRONCO OILFIELD SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

**Mark R. Hornak, Chief United States District Judge**

This case presents an intricate combination of record facts as considered in the context of the legal principles applicable to cases arising under Title VII of the Civil Rights Act of 1964, along with the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the allocation of decisional responsibility between the Court and a jury. While many of the events central to the disposition of these matters are straightforward, not much else about this case is. The Defendant has moved for summary judgment on all claims, a motion the Plaintiff opposes. The question before the Court is whether these matters may be properly resolved without a trial as the Defendant contends. Because the Court concludes that they cannot, the Defendant's Motion for Summary Judgment will be denied, and the case set for trial.

The Plaintiff, Carlo Thomas, is African-American. He worked for Defendant Bronco Oilfield Services as a Flowback Hand. Over the course of ten (10) months, four (4) different non-African-American coworkers on four (4) different occasions called Plaintiff the n-word or a variation of the n-word while he was at work. The record reflects that the coworker involved in the first incident was issued an oral warning by the involved frontline supervisor, and that once

the Defendant's more senior officials eventually learned about that and the other subsequent incidents, it fired the offending employees who then still worked for the company. Plaintiff himself was later terminated from employment for attendance violations. Plaintiff now brings hostile work environment discrimination and retaliation claims under Title VII and the parallel provisions of the Pennsylvania Human Relations Act. Because a reasonable jury could conclude that the circumstances present in this case constituted a hostile work environment for which Defendant was vicariously liable, and because a reasonable jury could conclude that either or both of Plaintiff's protected activities of filing EEOC Charges and complaining of racial harassment were a "but for" cause of his termination, Defendant's Motion for Summary Judgment will be denied.

## I.   <u>BACKGROUND</u>

### A.   <u>Facts</u>

The resolution of the Defendant's Motion and the consideration of the arguments of the parties requires an extensive review of the record. The following material facts are undisputed[1] unless otherwise noted. Defendant Bronco Oilfield Services ("Bronco") provides drilling, workover, and production completion services in the oil and gas industry. (Defendant's Concise Statement of Material Facts ("Def.'s CSMF"), ECF No. 113, ¶ 1.)[2] Plaintiff worked in

---

[1] The facts are taken from the evidence of record that is either undisputed as indicated by the parties, or not fairly disputed on the record. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For efficiency, the Court omits separate citations to Plaintiff's (Responsive) Statement of Genuine Issues, ECF No. 117–1 ("Pl.'s CSMF"), where Plaintiff clearly admits to a fact contained in Defendant's CSMF. Similarly, the Court omits separate citations to Defendants' Response to Plaintiff's Statement of Genuine Issues ("Def.'s Response") where Defendant clearly admits to a fact contained in Plaintiff's CSMF. The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

[2] In a number of instances, Plaintiff admits Defendant's stated facts but then denies the allegations because they are "incomplete," and adds additional material, denials of unstated facts, and improper legal conclusions. For instance, he admits that the Harassment Policy contained certain provisions, but then "denies that the cited procedure is effective." (Pl.'s CSMF ¶ 7.) These types of responses contravene the Western District of Pennsylvania's Local Rule LCvR 56(C)(1), which instructs the party opposing a Motion for Summary Judgment to admit or deny each fact set

Defendant's Washington, Pennsylvania, shop, as a Flowback Hand beginning on April 15, 2014. (*Id.* ¶¶ 16–17).

Defendant maintains a policy ("Harassment Policy") prohibiting discrimination and harassment based on an employee's protected status, including an employee's race. (Def.'s CSMF ¶ 5.) The Harassment Policy includes a non-exhaustive list of examples of prohibited conduct, including the use of racial slurs. (Def.'s CSMF ¶ 6; Pl.'s Ex. 18, ECF No. 117–20, at 9.)[3] Defendant also maintains an Equal Employment Opportunity Policy that prohibits discrimination based on "race, color, natural origin, sex, age (40 and over), disability or any other protected status where otherwise qualified." (Def.'s CSMF ¶ 4; Pl.'s Ex. 18, ECF No. 117–20, at 9.)[4] The Harassment Policy contains a reporting procedure for employees who believe they have been subjected to discrimination or harassment. (Def.'s CSMF ¶ 7.) The Policy also prohibits retaliation against employees who raise complaints under it. (*Id.* ¶ 8.) The Policy instructs all supervisors and managers to "take appropriate action to prevent incidents" of harassment from occurring. (Pl.'s Ex. 18, ECF No. 117–20, at 7.) Should a supervisor or manager receive a complaint or report of harassment, the Policy requires them to contact Human Resources "to institute prompt investigatory measures and appropriate remedial action." (*Id.*)

forth in the movant's Concise Statement and explain denials of the movant's stated facts. This Rule does not authorize nonmovants to explain denials of other, unstated facts or "inferences." For the sake of efficiency, the Court will not note each instance where such occurs and the additional material does not respond to the fact as it was stated but will address any additional facts asserted by Plaintiff that arguably raise material factual issues.

[3] Plaintiff denies that the Harassment Policy explicitly states that it applies to racial harassment, citing his Exhibit 18, ECF No. 117–20. Exhibit 18 includes Defendant's statement of position in response to Thomas's EOCC Charge. It includes a copy of Defendant's Harassment Policy, which states that "[s]ome examples of prohibited conduct are . . . racial slurs" and also prohibits "[c]reating a working environment that is intimidating, hostile, or offensive or that adversely affects an employee's work performance because of . . . slurs." (ECF No. 117–20, at 6.) The Court concludes that this document does not create a disputed fact issue as to whether the Harassment Policy prohibited racial harassment—it did.

[4] Plaintiff "denies the inference that Bronco's equal opportunity policies were applied or effective at his workplace." (Pl.'s CSMF ECF No. 117, ¶ 4.) This denial does not create a disputed issue as to this fact because whether Defendant's policies were effective does not bear on whether Defendant *had* an equal opportunity policy or that policy's content.

Upon hire, employees receive a copy of the Harassment Policy during their orientation, and Bronco disseminates the Policy through its intranet. (Def's CSMF ¶ 9.) Employees receive training on the Policy, either in person or through a learning management system. (*Id.* ¶ 10.)

Defendant also has an attendance policy, which requires employees to notify their supervisor or department manager as soon as an employee knows that she will need to be absent or late. (*Id.* ¶ 12.) The attendance policy also provides that the District or Location Manager has the sole discretion on how to treat an employee's failure to call in to provide notice of lateness or absence. (*Id.* ¶ 13.) The attendance policy further specifies that being absent or late without proper notice will subject an employee to discipline, including dismissal. (*Id.* ¶ 14.) District managers have discretion in disciplining employees and enforcing the policy. (*Id.* ¶ 15.)

Plaintiff received, read, and acknowledged Defendant's Harassment Policy and Code of Business Conduct when he was hired. (*Id.* ¶¶ 18–19.) Plaintiff also understood Defendant's attendance policy, including the requirement of giving notice if he would be late or absent. (*Id.* ¶ 23.) As a Flowback Hand, he worked on remote job sites as well as at the Defendant's Washington, PA, shop. (*Id.* ¶ 20.) When he was hired, his supervisor was Justin Welty, who was later succeeded by Marty McNulty. (*Id.* ¶ 21.) Plaintiff also reported to the Washington location's District Manager, Michael Segers. (*Id.* ¶ 22.)

In or around July of 2014, Seth Krenzelak, a non-supervisory employee of Defendant, said to Plaintiff, "Hey my [n-word],"[5] in the shop during work hours. (Def.'s CSMF ¶ 24.) Another employee who witnessed this exchange reported the incident to McNulty,[6] who met

---

[5] Given the context in which this case arises, the Court concludes that a reader having rational awareness understands exactly what racial epithet is at issue here, so the Court need not recount it verbatim. *See Castleberry v. STI Group*, 863 F. 3d 259, 264 (3d Cir. 2017); *Hite v. Manor Junior College*, 301 F. Supp. 3d 478, 480–81 (E.D. Pa. 2018).

[6] Plaintiff contends that "the allegation is incomplete" because it does not include that "Plaintiff reported the incident to McNulty the same day it happened." Plaintiff cites to his deposition testimony, but that testimony states

with Plaintiff and asked Plaintiff what he wanted McNulty to do. (Def.'s CSMF ¶ 25.) Plaintiff

told McNulty that he was upset, humiliated, angry, and disgusted, and replied "[you're] the

supervisor, [you] should do what [you're] supposed to do. Do what's right." (Dep. of Carlo L.

Thomas ("Thomas Dep."), ECF No. 114–3, at 48:12–18.) McNulty instructed Krenzelak to

apologize and allowed Plaintiff to leave for the day after McNulty asked Plaintiff if he wanted to

return to work and Plaintiff said he did not because he was "too upset." (Def.'s CSMF ¶ 26;

Thomas Dep. 48:10–24.) Krenzelak told McNulty that he made a mistake and was "just trying to

be friendly." (Def.'s CSMF ¶ 27; Dep. of Marty McNulty ("McNulty Dep."), ECF No. 114–4, at

49:16–17.)

Beyond leaving early that day, Plaintiff did not miss any work as a result of Krenzelak's

use of the racial slur. (Def.'s CSMF ¶ 28.) Plaintiff and Krenzelak continued to work on the same

job site. (*Id.* ¶ 29.) Although Plaintiff told McNulty that he did not want to be in Krenzelak's

presence again, McNulty scheduled them to work the same shifts, but in different trucks.

(Thomas Dep. 51:2–14.) Plaintiff did not have to interact with Krenzelak. (Def.'s CSMF ¶ 29;

Thomas Dep. 52:15–17.) At the time of the incident, Plaintiff did not report Krenzelak's use of a

racial slur to Segers. (Def.'s CSMF ¶ 30.) At some point after the incident, but not around the

same time period as the incident, McNulty reported the incident to Segers. (Pl.'s CSMF ¶¶ 30,

37.) Neither McNulty nor Segers reported this incident to Defendant's Human Resources ("HR")

department, (Pl.'s CSMF ¶¶ 37, 39; Def.'s CSMF ¶ 50; McNulty Dep. 44:17–45:2), and Plaintiff

did not report Krenzelak's use of a racial slur to HR until February 4, 2015. (Pl.'s CSMF ¶ 31.)

In October of 2014, Flowback Operator David Emrock, another non-supervisory

employee, directed the n-word toward Plaintiff while they were alone together in a company

---

that "Somebody—I don't know who went and reported to Marty McNulty." (Dep. of Carlo L. Thomas ("Thomas Dep."), ECF No. 114–3, at 47:9–13.) This testimony does not create a dispute of material fact.

truck. (Def.'s CSMF ¶ 32.) Plaintiff did not report the Emrock incident to any supervisors or HR

at that time. (*Id.* ¶ 33.) However, Plaintiff did not work with Emrock after that day. (*Id.* ¶ 34.)

Defendant terminated Emrock's employment on January 20, 2015, for unsatisfactory

performance. (*Id.* ¶ 35.) Between the incidents with Krenzelak and Emrock, from July 2014

through October 2014, Plaintiff did not feel that his work environment impeded his ability to do

his job. (*Id.* ¶ 36.)[7]

---

[7] Plaintiff denies this, claiming that it mischaracterizes his deposition, in which the following exchange took place:

> Q: Now, between the time of the Seth Krenzelak incident in June or July of 2014 and the David Emrock incident, October 2014, did you have any problems with your work environment that impeded your ability to perform your job?

> A: No.

(Thomas Dep. 57:25–58:5.)

Plaintiff submitted an affidavit in opposition to Defendant's Motion for Summary Judgment, in which he said he "thought that Bronco's attorney was talking about [his] *physical* work environment" and stated that his fear of being the target of racial attacks "made it mentally and emotionally more difficult for [him] to concentrate on [his] work." (Declaration of Carlo L. Thomas in Opposition to Def.'s Motion for Summary Judgment ("Thomas Decl."), Pl.'s Ex. 9, ECF No. 117–11, at 3–4.) The record does not reflect that the Plaintiff reviewed the transcript of his deposition and advised the officer transcribing it of any such changes to the substance of his testimony. *See* Fed. R. Civ. P. 30(e).

Defendant urges the Court to disregard this affidavit as a "sham affidavit," which the Third Circuit has held is insufficient to create a genuine issue of material fact. *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251–53 (3d Cir. 2007) ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)). "The timing of the affidavit, whether there is a plausible explanation for the contradictory statements, and whether there is independent evidence in the record supporting the affidavit, may be considered when determining whether an affidavit is a sham." *J.R. v. Lehigh Cty.*, 534 F. App'x 104, 108 (3d Cir. 2013). Plaintiff's affidavit is not notarized. (*See* Thomas Decl.) It does contain an affirmation on penalty of perjury as contemplated by 28 U.S.C. § 1746. It is not dated, as required by § 1746. However, Counsel has requested that the Court treat it as dated on the day it was filed, February 15, 2019. The Court will do so, as the date is only pertinent so far as it indicates that the affidavit was sworn *after* Plaintiff's deposition.

In general, "prior depositions are more reliable than affidavits." *Jiminez*, 503 F.3d at 253. However, when deposition testimony is ambiguous or incomplete, subsequent affidavits may help to clarify the testimony without being disregarded as sham documents. *Morini v. Castle Cheese, Inc.*, No. 10–1739, 2013 WL 5436928, at *11 (W.D. Pa. Sept. 27, 2013). The Court will not disregard the affidavit wholesale, but will instead consider, for each occasion that it is cited but Defendant contests the citation, whether there is a plausible explanation for any contradictory statements in question and whether independent record evidence supports the affidavit's statements.

Plaintiff's declaration statements that his answer to the questions noted in his deposition related only to his physical work environment will be disregarded in applying these principles because they are sufficiently in conflict with his deposition testimony. Plaintiff was deposed at length about the circumstances surrounding the racial slur incidents at work. During follow-up questions about those incidents, he was asked whether he had problems or

In December 2014, Plaintiff was written up for a no-call, no-show. (*Id.* ¶ 37.) At that time, he informed Segers for the first time of the Krenzelak and Emrock incidents, without revealing Krenzelak and Emrock's identities. (*Id.*)[8] Plaintiff did not dispute that he no-call, no-showed, but told Segers he felt the disciplinary action was unfair because "these guys," (that is, Krenzelak and Emrock) had not been disciplined for what they did. (*Id.* ¶ 38; Thomas Dep. 59:4–10.) Segers asked Plaintiff for details, such as who used the slurs and when, and Plaintiff responded to Segers by stating "[d]on't worry about it," and did not provide any details. (Def.'s CSMF ¶ 39.)[9] Segers told Plaintiff that he would act on his behalf if he needed help and

_____

issues with his work environment. His unequivocal "no" as set forth above is not ambiguous or incomplete. His subsequent explanation in his declaration does not add up, because he was never questioned about his physical work environment and the context of the questioning was clearly his perception of the work environment in light of the Krenzelak and Emrock incidents. The Court will therefore disregard the affidavit statements regarding his work environment to the extent that the Plaintiff now says that his answer was limited to his physical work environment. The question and the answer will stand, and such will be what the Court considers.

The Defendant's argument from that deposition testimony that it is indicative that as a subjective matter the Plaintiff was either not subjectively impacted by being called the n-word or that the coworker conduct could not be considered severe or pervasive reads too much into the question as asked and answered. Even if the Plaintiff could still "perform his job," that would not mean that the harassment had not been abusive, or severe or pervasive, but only that, literally, the Plaintiff could still do his job, whether by toughing his way through it so to speak or otherwise. That does not necessarily equate to a conclusion that the actions of the Plaintiff's coworkers could not be found to have been unwelcome, nor were necessarily not severe or pervasive. Of course, the Defendant may seek to argue to the jury that the Plaintiff's conditions of employment were not altered by the incidents at issue here, or that the conduct involved was not abusive or did not become severe or pervasive, but in the Court's judgment, the Plaintiff's answer to the question actually asked neither commands such conclusions, nor does it preclude them. It is therefore a "genuine" issue of a fact that is "material."

[8] It is disputed whether Segers knew about the slurs beforehand. McNulty testified in his deposition that he told Segers about the incidents at some point but could not recall when. (McNulty Dep. 52:20–53:2.) However, it is undisputed that December 2014 was the first time that *Plaintiff* told Segers about the incidents. (Def.'s CSMF ¶ 37; Pl.'s CSMF ¶ 37.)

[9] Plaintiff denies this statement, citing to his deposition testimony and to his Declaration. In his deposition, the following exchange took place:

> A. I complained to Segers about being called a [n-word] in December of 2015 -- or '14, rather, December 2014, about me being called a [n-word] twice.
> Q. Okay.
> A. By Seth [Krenzelak] and another guy.
> Q. Who was the other guy?
> A. David Emrock.

instructed Plaintiff to let him know if anything happened again. (*Id.* ¶ 40.)[10] However, Segers did not find out until February of 2015, as a result of Plaintiff's later contact with HR, who the employees were who had used the slurs. (Dep. of Michael Segers ("Segers Dep."), ECF No. 117–23, at 57:4–8.)

In January 2015, Jose Vargas, another non-supervisory employee, said to Plaintiff, "F you, [n-word]. F you, F'ing [n-word]" in the presence of other coworkers at a remote job site. (Def.'s CSMF ¶ 41; Thomas Dep. 61:20–62:8.) Plaintiff had asked Vargas, "Jose, what does Jose mean in Spanish?" (Thomas Dep. 62:5–7.)

Another employee reported the incident to McNulty before Plaintiff got a chance to do so. (Def.'s CSMF ¶ 42; Thomas Dep. 62:23–63:1.) McNulty spoke to Plaintiff a few minutes after it happened. (Thomas Dep. 63:2–6.) McNulty asked Plaintiff if he wanted to leave work, and Plaintiff said he did. (Thomas Dep. 63:18–20.) Because they were at a field location, McNulty did not let Plaintiff go home from the job site, but separated Plaintiff and Vargas by having them perform different tasks until they were finished with the work and could return (in separate vehicles) to the yard. (Thomas Dep. 63:22–23; McNulty Dep. 58:16–21.)

McNulty then informed Segers of the Vargas incident. (Def.'s CSMF ¶ 42.) Segers notified the Director of HR, Stan Brouillette, on January 28, 2015. (Def.'s CSMF ¶ 43; Pl.'s CSMF ¶ 43.) Defendant fired Vargas effective February 4, 2015. (Pl.'s CSMF ¶ 47; Pl.'s Ex. 13,

---

(Thomas Dep. 52:15–21.) This testimony does not say that Plaintiff *told* Segers the names of the individuals who used the racial slurs. It does not contradict Segers's testimony that "He did not give me a name . . . he was asked who and when and he did not give that information up." (Segers Dep. 69:20–70:2.) Plaintiff's other cited testimony does not pertain to whether he told Segers any names. The citation to his Declaration, at ¶ 11, also does not discuss any information he provided to Segers. There is therefore no material dispute of fact as to whether Plaintiff told Segers the names of the people who used the slurs.

[10] Plaintiff denies this statement, saying that Segers never made this statement to Plaintiff. He cites to his deposition testimony, Thomas Dep. 60:2–8, which does not mention Segers making such a statement but also does not discuss Segers's conversation with Plaintiff. He also cites to his Declaration, at ¶ 12, which also does not say one way or the other whether Segers made this statement to him. This denial, without record evidence to support it, does not suffice to create a disputed fact issue on this point.

ECF No. 117–15, at 15.) Brouillette then called Plaintiff on February 5, 2015. (Def.'s CSMF ¶ 43; Thomas Decl. ¶ 18.) During the call, Plaintiff recounted the Vargas incident to Brouillette. (Def.'s CSMF ¶ 44.) Brouillette asked if any incidents had ever happened before, and Plaintiff then told Brouillette the details of the Krenzelak and Emrock incidents. (Def.'s CSMF ¶¶ 44–45.)

Brouillette followed up with an email to Plaintiff, requesting details of the prior incidents so that he could investigate them; however, Plaintiff did not respond to the email. (Def.'s CSMF ¶ 46.) Brouillette discussed Plaintiff's complaint with Senior Director of HR and Employment Counsel Tonja King, who recommended that Krenzelak and Vargas be terminated from employment. (Def.'s CSMF ¶ 47.)[11]

---

[11] Plaintiff also notes that Segers told Brouillette that he felt bad for Krenzelak because he had "had a string of bad luck" including a car accident. (Pl.'s CSMF ¶ 97.) Defendant objects to this as a hearsay statement and argues it is therefore inadmissible and cannot be considered on summary judgment. *See* Fed. R. Civ. P. 56(c)(2). Segers's statement is hearsay-within-hearsay, and therefore will only be admissible, under Rule 805, if "each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. The first layer of hearsay, Segers's statement to Brouillette, is a statement by a party opponent. Because Segers, Defendant's employee, was making the statement to HR about a matter within the scope of the employment relationship—his thoughts on firing an employee whom he supervised—this statement is admissible under Rule 801(d)(2)(D) because it is not hearsay. The second layer, Brouillette's email to King relaying this statement, would be admissible under the framework for emails laid out by Judge Barbier in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2012 WL 85447 (E.D. La. Jan 11, 2012). In that case, the Court identified five (5) requirements to satisfy Rule 803(6)'s business records exception:

    (1)  "[T]he email must have been sent or received at or near the time of the event(s) recorded in the email."

    (2)  "[T]he email must have been sent by someone with knowledge of the event(s) documented in the email."

    (3)  "[T]he email must have been sent or received in the course of a regular business activity, which requires a case-by-case analysis of whether the producing defendant had a policy or imposed a business duty on its employee to report or record the information within the email."

    (4)  "[I]t must have been the producing defendant's regular practice to send or receive emails that record the type of event(s) documented in the email."

    (5)  "[A] custodian or qualified witness must attest that these conditions have been fulfilled . . ."

*Id.* at *3 (footnotes omitted). The Court concludes that all five (5) elements are satisfied here. Nothing suggests that the email was not sent around the time Brouillette spoke to Segers about firing Krenzelak, or that Brouillette lacked knowledge of his conversation with Segers. It appears Brouillette sent the email in the course of evaluating, with the head of HR, whether to fire Krenzelak and Pressley, which is a regular business activity. Nothing suggests that it was not the HR department's regular practice to discuss such matters via email. And the Court presumes that a witness, such as Brouillette or King, could attest to these things.

The next day, Brouillette called Plaintiff and informed him that Krenzelak and Vargas had been fired for using racial slurs and encouraged Plaintiff to contact him if he experienced any additional problems or retaliation. (Def.'s CSMF ¶ 48.) King also spoke to Plaintiff on the phone and told him to contact her if he needed anything. (*Id.* ¶ 49.)

Defendant also disciplined and counseled McNulty and Segers for failing to escalate the Krenzelak and Emrock incidents to HR in a timely manner. (Def.'s CSMF ¶ 50.)[12] Plaintiff was satisfied with Defendant's response to the Vargas incident. (Def.'s CSMF ¶ 51.)

Between the incidents with Emrock and Vargas, from October 2014 through January 2015, Plaintiff stated that he had no issues with his work environment. (Thomas Dep. 72:1–73:1.)  Plaintiff took the day off work to visit his doctor the day after the Vargas incident and was prescribed medication for anxiety and depression. (Pl.'s CSMF ¶ 87; Def.'s Reply ¶ 87; Thomas Dep. 72:21–75:9.) His doctor did not recommend that Plaintiff not return to work. (Thomas Dep. 75:14–16.) Plaintiff took the medication for "about a month," but then stopped. (Thomas Dep. 75:10–19.)  He did not follow up with his physician's referral to a psychologist or psychiatrist. (*Id.*) He did not visit his physician for this issue after the initial visit. (*Id.*)

On February 19, 2015, Defendant received notice of a charge of discrimination filed with the EEOC ("First EEOC Charge"). (Pl.'s Ex. 10, ECF No. 117–12, at 15.) The First EEOC Charge referred to dates between July 1, 2014, and January 31, 2015. (Pl.'s Ex. 15, ECF No.

---

This statement is admissible, but it is immaterial to the issues at hand because Krenzelak ultimately *was* fired, and Segers told Brouillette that he in fact would fire Krenzelak if HR instructed him to do so. (Pl.'s Ex. 10, ECF No. 117–12, at 17.)

[12] Plaintiff denies this statement on the basis that the Corrective Action Report ("CAR") given to Segers and signed by Segers was never signed by a management official. (*See* Pl.'s Ex. 10, ECF No. 117–12, at 7.) However, Segers testified that his superior, Mark DeGarmo, gave him a final warning for not escalating the December 2014 incident. (Segers Dep. 102:8–23.) King also testified in her deposition that she was "certain" that Segers (and McNulty) had been written up for not escalating information about Plaintiff's complaint in a timely fashion. (King Dep. 82:5–24.) Plaintiff's denial does not create a disputed factual issue, as the fact that a supervisor did not sign the CAR does not directly contradict Segers's and King's testimony that Segers was written up.

117–17, at 2.)

On March 9 and 10, 2015, Defendant conducted anti-harassment training at the Washington, PA, shop. (*Id.* ¶ 53.) Plaintiff said the training consisted of an anti-harassment video that mostly focused on sexual harassment but also addressed racial harassment. (Thomas Dep. 81:12–82:12.)

On March 15, 2015,[13] another non-supervisory coworker, James Pressley, called Plaintiff a "ninja" while the two were on a remote job site. (Def.'s CSMF ¶ 54; Thomas Dep. 78:6–79:12.) A supervisor, Tony Hale, was present and immediately disciplined Pressley. (Def.'s CSMF ¶ 55.) Hale reported the incident to management, and Pressley was terminated the following day. (*Id.*)[14] King recognized that Pressley's use of the word "ninja" "could constitute a hostile work environment and/or retaliation in light of [Plaintiff]'s claim." (Pl.'s CSMF ¶ 135.) Segers also called a meeting in the shop to emphasize that such behavior was not acceptable and that any music played in the shop must be "clean" and not use the n-word. (Def.'s CSMF ¶ 56.)[15]

After Pressley was fired, he sent Plaintiff threatening text messages, using the n-word and telling Plaintiff to "meet him [at] the gas station down the road." (Def.'s CSMF ¶ 57; Thomas Dep. 79:9–10.) Segers forwarded these messages to King. (Def.'s CSMF ¶ 57.) King sent Pressley a "cease and desist" letter. (*Id.* ¶ 58.)

---

[13] Plaintiff denies that this occurred on March 15 and says it actually had occurred on March 16, 2015. (Pl.'s CSMF ¶ 54.) This discrepancy is immaterial.

[14] It is undisputed that Hale reported the incident when the team returned to the shop, but that Thomas and Pressley were still together at the remote job site. (Thomas Dep. 79:5–8.) Plaintiff characterizes Hale's reporting as "delayed." (Pl. CSMF ¶ 100.) However, context clarifies that Hale reported the incident to Segers the same day, when the team returned to the shop from the job site. Whether that is a "delay" for purposes of the prompt and remedial action analysis for discrimination is a question of law, not a question of fact.

[15] Plaintiff denies this statement on the basis that Segers said at his deposition that he was not sure when, exactly, the meeting happened. This denial does not create a disputed issue as to whether such a meeting occurred. Plaintiff also denies this statement on the basis of the statement in his Declaration that he never heard Segers make such an announcement or never heard his coworkers talking about such a meeting. (Thomas Decl. ¶ 16.) Setting aside the fact that Plaintiff did not testify in his deposition that the meeting did not occur, the fact that Plaintiff (in his later Declaration) does not recall the meeting is not evidence that it did not happen.

Plaintiff filed a second Charge of Discrimination ("Second EEOC Charge") with the EEOC on March 18, 2015, alleging a racially hostile work environment. (Def.'s CSMF ¶ 59.) Plaintiff also believed at that time that "white guys" did not want to work with him. (Pl.'s CSMF ¶ 138; Thomas Dep. 93:18–94:18.) His supervisors scheduled him to work with African-American leads, but he also occasionally worked with white leads after March 2015. (Thomas Dep. 94:2–18.)

On or about March 23, 2015, McNulty was speaking to Mark Hale in the shop. Plaintiff overheard part of the conversation and accused them of saying negative things about him. (*Id.*) The actual content of the conversation is disputed, but Plaintiff testified that he heard only snippets of the conversation. (Thomas Dep. 91:4–92:22.) McNulty testified, and provided a written statement to HR, that he and Hale were talking about employees who left trash in the yard and Hale informed him that Plaintiff had cleaned it up and had done a good job. (McNulty Dep. 65:23–68:22.) Plaintiff testified that after he heard his name mentioned, he heard McNulty say "troublemaker" and "downfall of the company." (Thomas Dep. 92:12–18.) However, Plaintiff also testified that "I heard nothing before my name." (Thomas Dep. 92:22.) McNulty said in his written statement that Plaintiff "took out of context what [we] said about another employee that was trying to break down what we all worked hard to make better, [referring] to a dis[g]runtled employee that was just recently [laid] off. . . . Mark Hale is the only one that mentioned [Plaintiff's] name and it was in a good ref[]erence!" (ECF No. 122–3, at 8.)

On or about March 25, 2015, Plaintiff called Brouillette and complained that McNulty was not talking to him, that he felt he was not being sent out into the field, and that he was being denied hours and overtime because he was working in the yard rather than the field, in retaliation

for having complained of the racial slurs. (Def.'s CSMF ¶ 60; Pl.'s CSMF ¶¶ 117, 120.)[16] Brouillette told Plaintiff he would look into these concerns. (*Id.* ¶ 61.) It is disputed whether Brouillette was able to substantiate Plaintiff's claims. (Def.'s CSMF ¶¶ 60–61; Pl.'s CSMF ¶ 61.) After Plaintiff's call to Brouillette, management began sending him out to the field. (Thomas Dep. 87:22–88:17.) Plaintiff was satisfied with how Brouillette addressed the complaint. (Thomas Dep. 87:13–16.)

Plaintiff missed work without notifying a supervisor (no-call, no-show) in December of 2014 and was written up as a result. On March 4, 2015, Segers reported to Brouillette and King that Plaintiff showed up for work late, at 7:23 A.M., when "shop time" was 7:00 A.M. (Pl.'s CSMF ¶ 121.) Mark Hale asked Plaintiff if he was told that shop time was 7:00 A.M. (Pl.'s Ex. 10, ECF No. 117–12, at 13.) Plaintiff said he was not. (*Id.*) Hale said he would give him the benefit of the doubt but instructed him to show up at 7:00 in the future. (*Id.*) Plaintiff responded that he was going to clock out and go home. (*Id.*) He then said "[t]his is bullshit this is harassment man." (*Id.*)[17]

On March 11, 2015, Segers told King that he was informed that Plaintiff had not turned in Department of Transportation ("DOT")-mandated driver logs in some time and wanted to know how she would like to proceed if he did not turn them in by March 16, 2015. (Pl.'s CSMF ¶ 101.) King asked Segers "[h]ave you [terminated] other guys who are behind on their logs

---

[16] Plaintiff and other Flowblack Hands worked a "100/100/40" schedule, where they would work 100 hours a week in the field for two (2) consecutive weeks, and then work in the yard for one forty (40) hour work week. (Pl.'s CSMF ¶ 114.) In March 2015, Plaintiff was "stuck in the shop to . . . work 40 hours a week, maybe a little more, and that's it." (*Id.* ¶ 115; Thomas Dep. 86:22–87:7.)

[17] Plaintiff also cites to other employees who punched in after the 7:00 shop time but were not penalized. (Pl.'s CSMF ¶ 125.) One employee arrived at 7:03, one at 7:08, and two others wrote in their start time of 5:00 A.M. by hand. (Pl.'s Ex. 14, ECF No. 117–16, at 2.) However, the timecards Plaintiff cites to do not reflect whether any of the late employees notified a supervisor that they would be arriving late, or whether any of those employees were counseled for arriving late. To the extent this can be characterized as a "dispute," it ultimately is immaterial because Plaintiff was not disciplined for arriving late on March 4, 2015.

anytime during the past 3 years? . . . If not, what have you done in the past?" (*Id.* ¶ 136.) On March 16, 2015, Plaintiff was issued a warning, namely a Corrective Action Report ("CAR"), for his being nine (9) months behind in completing his DOT logs. (Def.'s CSMF ¶ 63.)[18] Plaintiff signed the CAR, and even though he felt it was unfair, he did not object to or dispute the warning, and did not complain to Brouillette about it when he spoke to him ten (10) days later. (*Id.* ¶ 64; Thomas Dep. 96:1–19.) On March 30, 2015, Segers emailed King a screenshotted text that he sent Plaintiff saying he needed to fill in for another employee. (Pl.'s CSMF ¶ 128.) Plaintiff did not respond and did not fill in and was not disciplined. (Pl.'s Ex. 10, ECF No. 117–12, at 21.) On another occasion in April of 2015, Segers sought advice from HR about an unidentified issue concerning Plaintiff. (Pl.'s CSMF ¶ 137.) Brouillette advised him to "write him up like we did the other employee," and asked for King's view. (Pl.'s Ex. 10, ECF No. 117–12, at 20.) It does not appear from the record that Plaintiff was ever written up or disciplined for whatever that issue was.

In around September of 2015, Plaintiff again fell behind on his DOT logs. (Def.'s CSMF ¶ 65.)[19] McNulty prepared a CAR for this event but did not issue it to Plaintiff. (Pl.'s Ex. 17, ECF No. 117–19, at 6.) On September 19, 2015, Plaintiff was a no-call, no-show to work and McNulty prepared another CAR. (Def.'s CSMF ¶ 66.)[20]

---

[18] Plaintiff denies that he actually failed to turn in his DOT logs, on the basis that if he had failed to turn in his DOT logs for nine (9) months, that would have been the period of June 2014 to March 2015, but his performance evaluation in June 2014 did not mention a failure to turn in his DOT logs. (Pl.'s CSMF ¶ 63.) A positive performance evaluation from June 2014, the beginning of the period in which Plaintiff failed to turn in his DOT logs, does not bear on whether he failed to turn in his logs for nine (9) subsequent months. Nor does it bear on the undisputed fact that Plaintiff was written up for this failure. Moreover, Plaintiff acknowledged that he had mistakes in his logs that caused him to be behind. (Thomas Dep. 96:1–4.)

[19] Plaintiff denies this statement on the basis that his logs needed correction, not that he was actually "behind" on the logs. This difference is semantic and immaterial: if the logs needed correction, they were lacking in some accurate information and were by definition incomplete.

[20] Plaintiff denies that he was scheduled to work on September 19, 2015. (Pl.'s CSMF ¶ 66.) King testified that she did not look up any payroll records to check whether Plaintiff was scheduled to work on that date. (*Id.* ¶ 133; King

It is disputed whether Plaintiff received the CAR for the September 19 no-call, no-show. McNulty said that he notified Plaintiff of the CAR when he returned to work the next day and that he offered him a copy of the document, but Plaintiff refused to sign it. (McNulty Dep. 32:7–24.) Plaintiff said that "I never received this document. I never seen it." (Thomas Dep. 100:22–23.) McNulty told King that "he just has not had [Plaintiff] sign yet." (Pl.'s Ex. 17, ECF No. 117–19, at 6.) Employees are not required to sign a copy of the CAR, but usually, when someone did not sign a CAR, a management employee would sign the document as a witness indicating that the employee received it. (Pl.'s CSMF ¶ 102.)

On September 30, 2015, Plaintiff was late to work—arriving at 10:45 A.M.—without notifying his supervisor. (Def.'s CSMF ¶ 68.) Welty gave him a CAR[21] and sent him home. (Def.'s CSMF ¶ 68.)[22] That day, Welty emailed Segers two "pending" CARs, including for the September 19 no-call, no-show, and Segers forwarded them to HR. (Pl.'s Ex. 17, ECF No. 117–19, at 6–7.)

Segers consulted with King, who thought that termination was appropriate in light of Plaintiff's prior attendance violations and issues with timely completing DOT logs. (Def.'s

---

Dep. 102:6–103:23.) Plaintiff refers to his deposition testimony, where he said "I don't know where I was" on September 19, and then said that he did not know if he was scheduled to work or not. (Thomas Dep. 101:1–7.) He also refers to his weekly time report, in which there was an entry for Saturday, September 19, 2015, that was crossed out. (Pl.'s Ex. 7, ECF 117–9, at 3.) He also refers to a self-certification log of some kind, which he filled out and shows him as "off duty" on September 19, 2015. These documents do not reflect whether Defendant scheduled him for work, and he failed to report to work without calling in. Segers emailed King on September 22, 2015 and said Plaintiff "needed Saturday off. He was told to call [McNulty] to see if he could get it off. He never called in and didn't show up for work." (Pl.'s Ex. 10, ECF No. 117–12, at 9.)

[21] Segers approved of this CAR. (Pl.'s CSMF ¶ 68.)

[22] Plaintiff points out that on September 30, 2015, other employees arrived late to work and were not penalized. A review of Plaintiff's Exhibit 23 which provides a summary chart and copies of the timecards for the late employees shows that several of the late employees clocked in at 7:01 A.M., and the latest time an employee clocked in was 7:24 A.M. (Pl.'s Ex. 23, ECF No. 117–25.) By contrast, Plaintiff arrived at approximately 10:45 A.M. (ECF No. 114–3, at 79.)

CSMF ¶ 69.)[23] Additionally, Danielle Holland, the HR Leave of Absence Coordinator, forwarded the CARs to King and informed her that Segers contacted her "explaining this guy is trouble and you have personally dealt with him on the past." (Pl.'s Ex. 8, ECF No. 117–12, at 8.) Holland further explained that Segers told her Plaintiff was behind on his logs again and "wishe[d] to discuss possibly terminating [Plaintiff] because he has been so much trouble. [Segers] stated he feels like Carlo is acting like he has a hold on them because of his past of speaking with you." (Id.)[24]

While Plaintiff was on his way home, Segers called him and told him his employment had been terminated. (Def.'s CSMF ¶ 70.)[25] Plaintiff responded "F you. You retaliated against me." (Pl.'s CSMF ¶ 106.) The next day, Plaintiff returned to the office to turn in his company property and to talk to Segers about the reason for his termination and to get the reason in writing. (Def.'s CSMF ¶ 70; Thomas Dep. 105:2–3.) Plaintiff also spoke to King on the phone,

---

[23] Plaintiff's lengthy response to this factual statement "denie[s] the inference that Bronco fired Mr. Thomas for legitimate, non-discriminatory reasons." (Pl.'s CSMF ¶ 69.) This is a legal conclusion that does not bear on the factual issue of whether Segers consulted with King and what King recommended and why.

[24] Defendant objects to the Court considering this statement because it is hearsay. Segers's statements are indeed hearsay within hearsay as they were relayed by Holland in an email. Under the same multi-factor analysis addressed above, the Court will treat the email, or "outer" layer of hearsay, as a business record under Rule 803(6) because it was sent around the time Holland spoke to Segers and reflects Holland's knowledge of the events in the email, it was sent in the course of an HR consultation in the ordinary course of business, nothing suggests that it was not Defendant's regular practice to send this type of email, and the Court presumes that a witness could attest to these conditions.

As to the inner layer of hearsay, Segers (declarant)'s statement to Holland, that is a statement by a party opponent and therefore is admissible as nonhearsay under Rule 801(d)(2)(D).

[25] Plaintiff testified in his deposition that he could not remember what Segers told him the reason was for his termination. (Thomas Dep. 103:15–21.) In his CSMF, Plaintiff states that "[t]he reason for his termination went from his attendance to unsatisfactory work performance, insubordination, attendance/tardiness and failure to timely submit DOT logs consistent with management's instructions." (Pl.'s CSMF ¶ 108.) There is no record support for Plaintiff's statement that the reason for the termination changed.

and she told him that he was terminated for policy violations, specifically attendance and failure to complete his logs, and performance issues. (Def.'s CSMF ¶ 72.)[26]

White employees at Defendant's Washington, PA, location who had never complained of discrimination were issued corrective action and terminated for being absent or late without giving a supervisor notice. (*Id.* ¶ 73.) Plaintiff filed a Third EEOC Charge on December 2, 2015, alleging race discrimination and retaliation. (*Id.* ¶ 74.)

### B.    Procedural History

Plaintiff filed this lawsuit on October 11, 2016. (ECF No. 6.) The Court has reviewed Defendant's Motion for Summary Judgment (ECF No. 111), Plaintiff's Response in Opposition (ECF No. 117), and all briefing and exhibits in support therein. The Court then held Oral Argument and the matter is ripe for the Court's disposition.

## II.    STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

---

[26] Plaintiff cites to his Declaration, where he states that King also told him he was being let go because "you walk around the yard like you own the place and that you can't be fired because you have a charge with the EEOC." (Thomas Decl. ¶ 28.) The Court will disregard this portion of the Declaration, because it contradicts his deposition testimony at 105:21–106:4, in which he said there was nothing else he recalled King saying, and offers as an explanation for the new material only that he could not previously recall everything she said. Plaintiff claimed that since his deposition he reviewed the EEOC Charge, which refreshed his recollection of the event. However, Plaintiff received a hard copy of his EEOC Charge at the deposition and had an opportunity to review it at the time.

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) (quoting Fed. R. Civ. P. 56(a) & (e)). To meet its burden, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir. 1989). Moreover, a party's labelling or characterizing a fact as "disputed" does not make it so—the record evidence the opposing party points to must support the dispute of fact, whether through reasonable inference or otherwise. If the non-moving party's evidence merely is colorable or lacks sufficient probative force, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249–50 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See id.* at 250. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587; *Huston v. Procter & Gamble Paper Prods. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009).

In reviewing the record evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The line between reasonable inferences and impermissible speculation is often 'thin,' *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985), but nevertheless is critical because 'an inference based upon a speculation or conjecture does not create a material factual

dispute sufficient to defeat summary judgment.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990)). Any inference must follow directly from admissible evidence. *See Anderson*, 477 U.S. at 255.

It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See id.*; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004). Although summary judgment may be granted based on affidavits, conflicts of credibility should not be resolved on a motion for summary judgment unless the opponent's evidence is "too incredible to be believed by reasonable minds." *Losch v. Borough of Parkesburg.*, 736 F.2d 903, 909 (3d Cir. 1984) (quoting 6 *Moore's Fed. Prac.* ¶ 56.15(4)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *See Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 589 (3d Cir. 2005) (citing *Celotex Corp.,* 477 U.S. at 323–24).

## III.   DISCUSSION

Plaintiff asserts that Defendant unlawfully sustained a racially discriminatory hostile work environment that he had to work in and for which the Defendant is responsible, and that Defendant terminated him for complaining of racial harassment both to the Defendant and to the EEOC. Defendant argues that although Plaintiff was subject to racially-charged remarks directed to him by coworkers, those remarks did not create a hostile work environment, and that even if it could be found to have been such an environment, it was not one for which Defendant could be found to be vicariously liable given that the statements at issue were made by coworkers, not supervisors. Defendant asserts that it maintained an effective anti-harassment policy and

promptly terminated the employment of the offending employees once their conduct was brought to its attention. Defendant also contends that Plaintiff's termination was lawful because it followed multiple attendance violations, and there is insufficient record evidence to support a conclusion that those reasons were pretext for retaliation for the Plaintiff engaging in conduct protected by Title VII or that any statutorily-protected action of the Plaintiff was a cause of his discharge.

In considering the Plaintiff's claims, and the Defendant's Motion, the same analysis applies to both the Title VII claims and those asserted under the parallel provisions of the Pennsylvania Human Relations Act. *Donaldson v. SEPTA*, 821 F. A'ppx 128, 129 n.2 (3d Cir. 2020) (citing *Jones v. School Dist. of Phila.*, 198 F. 3d 403, 410 (3d Cir. 1999)).

For the following reasons, the Court concludes that because a rational jury could reasonably return a verdict for Plaintiff on both or either of his hostile work environment and retaliation claims, the Defendant's motion for summary judgment will be denied.

### A. <u>Hostile Work Environment Claim</u>

To demonstrate a hostile work environment based on racial discrimination, a plaintiff must show that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5*) respondeat superior* liability exists. *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990) (*superseded in part by statute as recognized in Moody v. Atl. City Bd. Of Educ.*, 870 F.3d 206 (3d Cir. 2017)).

In evaluating a hostile work environment claim, a court must consider the "totality of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 93 (3d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The central question is whether the workplace conduct could be found to have worked an objective change in the plaintiff's conditions of employment. *Abramson v. William Patterson College of New Jersey*, 260 F. 3d 265, 280 (3d Cir. 2001), quoting *Faragher v. Boca Raton*, 524 U.S. 775, 787 (1998).

### i.  "Severe or Pervasive" Discrimination

A hostile work environment is actionable under Title VII only if it is so severe or pervasive that it "alters the conditions of [the victim's] employment" and creates an "abusive working environment." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quotation marks and internal citations omitted). The environment must be objectively hostile, not only hostile in the plaintiff's view. *See Harris*, 510 U.S. at 21. Whether an environment is sufficiently hostile or abusive is also determined by considering the totality of the circumstances. *Breeden*, 532 U.S. at 270–71. "Severe or pervasive" is disjunctive, meaning that a sufficiently extreme but nonetheless isolated incident can create a hostile work environment. *Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017).[27]

Defendant contends that it is entitled to summary judgment because the conduct Plaintiff alleges does not rise to the level of severity or pervasiveness necessary to create a hostile work environment. Defendant points out that Plaintiff's claim is based on four (4) incidents, involving four (4) separate coworkers, with each occurring several months apart. Plaintiff counters that the

---

[27] "Severity and pervasiveness are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is regular and pervasive." *Norfolk v. GEO Group, Inc.*, No. 3:17-cv-204, 2020 WL 1873991, at *9 (W.D. Pa. April 15, 2020).

n-word in particular is so offensive that it would detrimentally affect a reasonable person, and that supervisors tolerated non-supervisory employees' use of the n-word to such a degree that its use in the workplace here should be imputed to Defendant.

As to this issue, the first question to be addressed is whether the Plaintiff's coworkers' repeated use of the n-word directed at the Plaintiff could in these circumstances be found to constitute severe or pervasive racially hostile conduct. While it is true that the Supreme Court has instructed that Title VII is not "a general civility code for the American workplace," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998), the record here reflects conduct that is fundamentally different in kind and degree than a case in which there is only repetitive bothersome conduct. The question is whether a jury could conclude that the n-word repeatedly directed at Plaintiff in the circumstances present here was so offensive that "it need not happen often to create a hostile work environment." *Mintz v. Dist. of Columbia*, No. 00–539, 2006 WL 1518954, at *3 (D.D.C. May 30, 2006).[28]

The profound impact of the n-word, and of it being directed at others, particularly in the workplace, has been recognized in other cases. "The Court expresses its sincere hope that little need be said to establish the objective offensiveness, and the severity of that offense, of the [n-word]." *Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535, 547 (D.N.J. 2018). "Courts have repeatedly concluded that the use of the [n-word] in the workplace is particularly odious and offensive." *Anderson v. Phoenix Beverages, Inc.*, No. 12CV1055DLIST, 2017 WL 9481014, at

---

[28] The Third Circuit has explained that the alleged discriminatory conduct must be viewed in context from the perspective of a reasonable person of the same racial or ethnic background as the plaintiff. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (stating that a plaintiff alleging a Title VII hostile work environment claim must show that the racial harassment "would detrimentally affect a *reasonable person of the same race* in that position") (emphasis added); *see also McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1115–16 (9th Cir. 2004) (stating that Title VII allegations of a racially hostile workplace must be assessed from the perspective of a reasonable person of the same racial group as the plaintiff); *see id.* at 1116 ("By considering both the existence and the severity of discrimination from the perspective of a reasonable person of the plaintiff's race, we recognize forms of discrimination that are real and hurtful, and yet may be overlooked if considered solely from the perspective of an adjudicator belonging to a different group than the plaintiff.").

*14 (E.D.N.Y. July 17, 2017), *report and recommendation adopted sub nom. Anderson v. Phoenix Beverages, Inc.*, No. 12-CV-1055 (DLI)(ST), 2017 WL 4767447 (E.D.N.Y. Sept. 30, 2017). The United States Court of Appeals for the Ninth Circuit described it as "the most noxious racial epithet in the contemporary American lexicon." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1988); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) ("It is beyond question that the use of the [n-word] is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is 'perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry.'") (citation omitted).  "Far more" than a "mere offensive utterance," the n-word is "pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001); *see also Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 262–63 (E.D.N.Y. 2019) ("The [n-word] evinces a hatred and disgust of African Americans and invokes dehumanizing stereotypes that served to justify centuries of social, economic and political discrimination."); *Mason v. SEPTA*, 134 F. Supp. 3d 868, 875–76 (E.D. Pa. 2015) ("The remark is hardly ambiguous when it come to racial prejudice, as it has been described as the 'paradigmatic slur' toward African-Americans and the 'most socially consequential insult.'"); *Daso v. Grafton Sch., Inc.*, 181 F. Supp. 2d 485, 493 (D. Md. 2002) ("No word in the English language is as odious or loaded with as terrible a history.").

   While there can be little doubt that the n-word being directed to another person would be offensive and demeaning, evaluation of the Plaintiff's claim nonetheless requires the assessment of such a workplace harassment claim to be made through the lens of a "totality of the circumstances" test. The caselaw cited by the Plaintiff in support of an argument that the n-word would in all cases create a hostile work environment refers to the use of the n-word by

*supervisors*. Although the Plaintiff argues that when racist remarks are unchecked, the effect is as if the epithet were directed at Plaintiff by his supervisors,[29] the authority he cites for this proposition is not directly on that point, as in that case, *Daniel v. T.M. Protection Resources, LLC.*, the plaintiff's *supervisor* made the statement "You F---ing [n-word]" to the plaintiff. *See* 689 F. App'x 1, 2 (2d Cir. 2017). While the Plaintiff's argument carries some force, it still must be considered as part of the "totality of the circumstances" analysis and does not in and of itself resolve the liability issue as to this claim.

In considering the Defendant's motion, the Court must then focus on a record which includes evidence of the conduct of four (4) different coworkers in a smaller workforce in which employees are sent with each other into the field to work in smaller groups over long hours in close quarters. It is neither a leap of logic nor speculation to conclude that a jury could rationally find that an African-American employee being directly addressed and referred to with the n-word or a variation of it four (4) separate times by four (4) different coworkers puts him in the middle of a workplace environment where race-based workplace harassment could reasonably be found to be "severe" or "pervasive" or both.[30] Indeed, the Defendant's senior HR manager stated that there is no context in which the use of the n-word to address another person would ever be appropriate. (Dep. of Tonja King ("King Dep."), ECF No. 117–22, at 131:25–133:3.) Given the abject racial import of that direct term of address, coming from four (4) different coworkers on four (4) different occasions, each in a workplace with working conditions as described above, this treatment could be found to be "severe enough to contaminate [the] environment" so as to be

---

[29] This argument is a variation on, but distinct from, Plaintiff's argument that Defendant is liable for the coworkers' racial slurs under a *respondeat superior* theory. That argument will be addressed *infra*.

[30] As other courts have recognized, a racial slur being directed at a plaintiff by others, as opposed to its more generalized utterance, makes a significant difference in the analysis here. *See Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 638 (7th Cir. 2019); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254–55 (11th Cir. 2014); *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004).

severe or pervasive.[31] *Norfolk*, 2020 WL 1873991, at *9. A rational jury could conclude as much

on the record before the Court. The analysis thus proceeds to the next step.[32]

### ii. Subjective Detrimental Effect

"[If the] victim does not subjectively perceive the environment to be abusive, the conduct

has not actually altered the conditions of the victim's employment, and there is no Title VII

violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). While no single factor is

required, "[t]he effect on the employee's psychological well-being is, of course, relevant to

determining whether the plaintiff actually found the environment abusive." *Id.* at 22; *cf. Jensen v.*

*Potter*, 435 F.3d 444, 451 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. &*

---

[31] The intensely fact-specific nature of this inquiry is demonstrated by the decision in *Canada v. Samuel Grossi & Sons, Inc.*, No. 19-1790, 2020 WL 4436855 (E.D. Pa. Aug. 3, 2020). There, over the course of sixteen (16) months, three (3) employees used the n-word a total six of (6) times, four (4) in the plaintiff's presence, but only two (2) times directed at him (each of those times by the same employee and eleven (11) months apart). *Id.* at *10. The court there concluded that such conduct was insufficiently severe or pervasive to create Title VII liability. The circumstances here are sufficiently different so as to create triable issues on this claim. In this case, the frequency of the n-word (or its analog "ninja") addressed to the Plaintiff occurred more often over a materially shorter time period and involved four (4) different coworkers. And, in viewing the totality of the circumstances, it is material that the workforce here was not large, and it was both diffuse and intense in light of the employees working in smaller teams in the field, and up to 100 hours per week. In such circumstances, the jury could conclude that the coworker conduct's impact on the Plaintiff here was in effect sufficiently direct and repetitive so as to meet the "severe or pervasive" threshold.

[32] *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F. 3d 174 (3d Cir. 2020) is not to the contrary. In *Ali*, our Court of Appeals considered a hostile work environment claim under New Jersey's antidiscrimination law, which is interpreted and applied on the same terms as Title VII. *Id.* at 181. In that case, our Court of Appeals focused on the frequency, severity, and nature of the subject conduct, and concluded that coworkers referring to Ali as anti-Semitic, unpatriotic, and a conspiracy theorist were not actionable as they bore only a tenuous relationship to Ali's racial and ethnic identity (he was Muslim and Egyptian). *Id.* It also held that coworkers greeting him on several occasions with terms including "Hey Arabian Nights," "Hey, Big Egypt," and "Mufasa" and "Mufasa Ali," based on his middle name Mostafa, were not sufficiently severe so as to have altered his working conditions. Critical to the analysis here, our Court of Appeals observed that none of these terms were "as severe as the use of an unambiguous racial epithet." *Id.* at 182. Here, an unambiguously racial epithet was expressly directed at the Plaintiff on multiple occasions, an epithet that a jury could find to be an expression of direct racial animus by a coworker.

*Gresham v. Delaware Dept. of Health & Human Svcs.*, 821 F. App'x 146 (3d Cir. July 15, 2020) is in the same vein. There, our Court of Appeals affirmed the grant of summary judgment as to a hostile work environment claim in a case in which the plaintiff's supervisor referred to her as a "dumbass" and as being "clueless," having "f---ed up" a project, concluding that there was no evidence that the speaker's (who was of the same race, African-American, as the plaintiff) use of those terms implicated race. *Id.* at 151. And, the supervisor's statement that she had a preference for a white woman, white man, or Middle Eastern woman for the position held by the plaintiff was insufficiently pervasive or severe to support a hostile environment claim. *Id.* Here, the mode of address to the Plaintiff was unquestionably tied to his race, coming on multiple occasions from multiple coworkers. The circumstances thus raise an inference of severity or pervasiveness that was not present in *Gresham*.

*Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (concluding that the subjective component had been met when the plaintiff testified at her deposition that "her coworkers' actions caused anxiety attacks, trips to the emergency room, and stress-induced use of her sick leave").

Plaintiff stated that he did not feel that the first two (2) incidents—those involving Krenzelak and Emrock—impeded his ability to "perform his job." But he did not say that he did not find the situation "abusive," one of the keys to the *Harris* formulation noted above. Nor does Plaintiff's self-perceived ability to "perform his job" resolve whether his conditions of employment had been objectively altered by the conduct at issue.

Plaintiff reported feelings of anger, stress, and humiliation, and that his demeanor changed as a result of the incidents. (Thomas Dep. 48:10–13, 130:23–131:6.) Plaintiff left work early after the Krenzelak incident (incident Number One) because he was "too upset" about what happened. (Thomas Dep. 48:22.) Plaintiff also testified he took at least one (1) sick day to go to the doctor after the Vargas incident (incident Number Three) and that he was at that time prescribed medication for depression and anxiety, although he stopped taking the medicine after a month and did not visit any type of therapist. (Thomas Dep. 73:10–74:6.) Though Plaintiff did not say whether his medical condition was related to his workplace environment, the timing of medical care is coincident with an "n-word" encounter with a coworker of the Plaintiff.

Plaintiff's broader statement that his work environment was not so negatively affected that he could not "perform his job" does go to his subjective assessment of his work environment and, as noted above, is part of the decisional equation here. But it is not conclusive. A work environment that is hostile and abusive can nonetheless be an environment in which an employee could still "perform his job." When the first episode occurred, Plaintiff told his supervisor that he (Plaintiff) expected his supervisor to "do his job" in terms of responding to  Krenzelak's conduct,

was upset enough that he went home for the day, and asked that he thereafter be separated from Krenzelak in the workplace. *See Vollmar v. SPS Techs., LLC*, No. CV 15-2087, 2016 WL 7034696, at *5 (E.D. Pa. Dec. 2, 2016) (finding that plaintiff put forth enough evidence that her workplace detrimentally affected her partially on the basis that she moved shifts to avoid the coworker who was allegedly harassing her). Plaintiff also testified that he felt that white coworkers did not want to work with him. (Thomas Dep. 93:23–94:18.) And, on two of the involved occasions (the first and the third), the Defendant's supervisor demonstrated that he would have recognized the negative impact of Plaintiff being called the n-word on the Plaintiff and his ability to work by offering for Plaintiff to go home early and agreeing to separate him from the offending coworker. In sum, the record reveals tangible subjective impacts on the Plaintiff beyond his taking offense at his coworkers' conduct. *See Fritz v. Uwchlan Ambulance Corps, Inc.*, No. 18-3181, 2020 WL 1042420 (E.D. Pa. Mar. 4, 2020).

The record here considered as a whole would allow a jury to conclude that as both an objective and subjective matter, the conduct of four (4) of the Plaintiff's coworkers, occurring over a relatively short period of time, and notwithstanding the unsuccessful actions by the Defendant to end them, sufficiently altered the terms and conditions of the Plaintiff's employment and was "abusive" as that term is considered for these purposes, at least for some periods of time, so as to constitute a hostile work environment made unlawful by Title VII. A jury could rationally conclude that two things were true at the same time—the Plaintiff could still "do his job," but was required to do so in an environment in which the conditions of his employment had been altered by the racially-based conduct of his coworkers, and that the workplace had by virtue of that conduct become "abusive." Therefore, the analysis must continue to the next step.

### iii. Vicarious Liability

Even if Plaintiff's coworkers subjected him to severe or pervasive harassment because of his race resulting in a hostile work environment, Plaintiff still has to make a sufficient showing at the summary judgment stage that a jury could hold Defendant liable for those actions under a *respondeat superior* theory (step five in the analysis). "Under Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. When coworkers are the perpetrators, the plaintiff must prove employer liability using traditional agency principles." *Andreoli v. Gates*, 482 F.3d 641, 648 (3d Cir. 2007) (quoting *Jensen v. Potter*, 435 F.3d 444, 452–53 (3d Cir. 2006)) (alteration omitted).

In *EEOC v. Xerxes* Corp., 639 F. 3d 658 (4th Cir. 2011) the Court compiled several legal principles that help guide the analysis of this claim. First, once an employer is on notice of hostile coworker conduct, it must respond with remedial action that is reasonably calculated to end the harassment. Second, the adoption and communication of a comprehensive anti-harassment policy is an important factor in assessing the reasonableness of an employer's actions, but its existence is not conclusive of that question, and if its implementation renders such a policy ineffectual, its evidence of reasonableness can be dissipated. Third, several factors illuminate whether an employer's response to coworker conduct is reasonably calculated to remediate that conduct, including the promptness of any investigation, the actions taken as to offending employees, and the actual effectiveness of the remedial action taken. *Id*. at 669–70 (internal quotations and citations omitted).

Recurrence of offending coworker conduct may, but does not necessarily, support a finding that the process was not reasonably calculated to end the misconduct, but the cessation of

the harassment is indicative of effectiveness. Because employer liability for coworker harassment is not strict, if the employer's actions are reasonably calculated to bring the harassment to an end, then those responses may be sufficient even if they do not succeed and the harassment persists. *Id*. In these regards, our Court of Appeals has held, "[a] remedial action that effectively stops the harassment will be deemed adequate as a matter of law. On the other hand, it is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate . . . as a matter of law." *Knabe v. Boury Corp.*, 114 F. 3d 407, 411–12 n.8 (3d Cir. 1997).

Plaintiff alleges that his coworkers created a hostile work environment for which the Defendant is legally responsible. To hold Defendant liable for that conduct, he would have to demonstrate that "the employer failed to provide a reasonable avenue for complaint or, alternatively, [that] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

First, as to the reasonable avenue of complaint,[33] Defendant maintains two (2) policies prohibiting workplace harassment in its Harassment Policy and Code of Business Conduct. The undisputed facts reflect that these policies are distributed to employees upon their hire and that employees receive continuing training on these policies. Plaintiff received, understood, and acknowledged copies of both policies when he was hired. The Harassment Policy provides

---

[33] Some of the analysis for *respondeat superior* liability in the case of coworkers' harassment overlaps with the *Ellerth-Faragher* defense to a hostile work environment claim. Plaintiff notes that the *Ellerth-Faragher* defense turns on whether the employer's response was reasonable. (Pl.'s Br., at 24.) But *Ellerth-Faragher* is an affirmative defense to employer liability conduct for *supervisors*' harassment of employees. At the stage of determining whether a defendant is vicariously liable for coworker harassment, it is Plaintiff's burden to show that the employer's avenue for complaint was not reasonable. *Donaldson v. Ronald Lensbouer & Somerset Cty.*, No. 15-63, 2017 WL 2199006, at *9 (W.D. Pa. May 18, 2017).

multiple avenues for an employee to complain of harassment, including to her supervisor, an HR director, a Company hotline, or other designated management officials.

"Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has" provided a reasonable avenue for complaint. *Fornah v. Cargo Airport Servs., LLC*, No. 12-CV-3638 RER, 2014 WL 25570, at \*7 (E.D.N.Y. Jan. 2, 2014) (quoting *Wahlstrom v. Metro–North Commuter R.R.*, 89 F. Supp. 2d 506, 523 (S.D.N.Y. 2000)). "Where an employer has promulgated a . . . harassment policy and informs all employees of its contents, such procedures will generally be deemed adequate, so long as employees are capable of invoking the process to enforce the policy." *Id.* A policy that is next-to-impossible to invoke, however, may create a dispute as to whether the employer's avenue for complaint was reasonable. *See Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (finding a genuine dispute of material fact as to the employer's actions where the plaintiff had to speak to five (5) different supervisors to elicit any response from management, management took five (5) months between the complaint and a response, and management's only instruction to the defendant was a one-page memo two (2) months after the last incident of harassment).

Plaintiff argues that the Harassment Policy is ineffective because it does not provide examples of racial slurs, and that the Code of Business Conduct does not mention racial slurs in its prohibited harassment. However, the Harassment Policy explicitly prohibits "racial slurs" and "profane language." (Pl.'s Ex. 18, ECF No. 117–20, at 6.) Plaintiff has not advanced any caselaw from which the Court would conclude that the Harassment Policy needed to—in addition to its prohibition on racial slurs and profanity—provide examples of prohibited slurs, such as the n-word or variations on the n-word, in order to provide a reasonable avenue for complaint of racial

harassment. His contrast with the sexual harassment portion of the Policy, which does include more examples, is unavailing. Defendant might have found it necessary to enumerate examples of sexual harassment that were less glaring or obvious than sexual touching but nonetheless violative of the Policy, such as "sexual banter" and "sexually suggestive materials (pictures, cartoons, etc.)." (*See* ECF No. 114–2, at 58.) An employee would not need to see the n-word spelled out in a company policy to know that it would constitute a racial slur as well as profane language. Indeed, one permissible inference to be drawn from Pressley's use of the word "ninja" was that it was a substitute for the n-word, a word that Pressley knew was itself prohibited.

The Defendant had a Harassment Policy in place during the relevant time period, one which provided both formal and informal procedures for making complaints of harassment. While Plaintiff takes issue with the Policy's efficacy, he has not adduced sufficient evidence to create a triable issue as to whether the channels made available to him were facially unreasonable. They are not, and accordingly, that means of establishing employer liability has not been satisfied.

But the Plaintiff may also establish *respondeat superior* liability for coworker harassment by demonstrating that Defendant "knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston*, 568 F.3d at 104. "[A]n employer knew or should have known about workplace . . . harassment if '*management-level* employees had actual or constructive knowledge about the existence of a . . . hostile environment.'" *Id.* (quoting *Andrews v. City of Phila*, 895 F.2d 1469, 1486 (3d Cir. 1990)). Defendant argues that here, too, it is insulated from liability because as soon as it learned of the involved incidents, it fired all of the offending employees who were still employed, and so its remedial action was sufficient as a matter of law. Plaintiff counters this by arguing that Defendant's action as to the Krenzelak

incident was not prompt because McNulty knew about the slur the day it happened, but Krenzelak was not fired for over 200 days (until HR later investigated and terminated him along with the other remaining employees who had used slurs).

An employer's awareness of Title VII coworker harassment may be established in two (2) ways.

> [F]irst, where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that such knowledge is important to the employee's general managerial duties. In this case, the employee usually has the authority to act on behalf of the employer to stop the harassment, for example, by disciplining employees or by changing their employment status or work assignments. The employee's knowledge of [Title VII] harassment is then imputed to the employer because it is significant to the employee's general mandate to manage employer resources, including human resources.
>
> Second, an employee's knowledge of [Title VII] harassment will be imputed to the employer where the employee is specifically employed to deal with [Title VII] harassment. Typically such an employee will be part of the employer's human resources, personnel, or employee relations group or department. Often an employer will designate a human resources manager as a point person for receiving complaints of harassment. In this circumstance, employee knowledge is imputed to the employer based on the specific mandate from the employer to respond to and report on [Title VII] harassment.

*Huston*, 568 F.3d at 107–08. "An employer may also have constructive notice of harassment if the harassment is 'so pervasive and open that a reasonable employer would have had to be aware of it.'" *Id.* at 105 n.4 (quoting *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 2009)).

The record reflects that Defendant had varying levels of knowledge of and response to the different incidents involving racial slurs. First, as to the October 2014 Emrock incident, Emrock used the slur when he was alone with Plaintiff, and Plaintiff did not report the incident to any supervisor or anyone in HR until after Emrock had already been fired for unsatisfactory job performance. Plaintiff avers that Defendant's response to the Emrock incident was inadequate

because after Plaintiff, months later, complained directly to Segers (referring to the Krenzelak and Emrock incidents but not naming the individuals), Segers "did nothing." (Pl.'s Br., at 26.) However, Plaintiff did not tell Segers the identities of the coworkers who used the slurs, and Segers told Plaintiff that he would act on Plaintiff's behalf if he needed help, and to tell him if anything else happened. Although Segers failed to report the incident to HR, which was itself a violation of the Policy for which he was later disciplined, *see* Pl.'s Ex. 18, ECF No. 117–20, at 7, the Court would be hard-pressed to conclude that Segers could force Plaintiff to disclose the identities of the offending individuals. But, under the Defendant's policy, Segers did not have that ultimate responsibility, since he was also obligated to promptly send it up the chain of command, which he did not do. It would be reasonable for a jury to conclude that a more robust and high-level investigative effort would have unfolded much more quickly had Segers done so immediately as he was obligated by the Policy, as is demonstrated by the reality that once the Defendant's upper-level HR managers became involved, that is what did happen, and the identity of the perpetrators was revealed.

Second, upon learning of the Vargas and Pressley incidents, Defendant fired the offending employees within days. While Plaintiff attempts to argue that Defendant exhibited internally inconsistent responses to Vargas (a Latino employee) and the white offenders, he does not and cannot argue that Defendant failed to take serious and immediate remedial action in response to those two (2) incidents once known by those in higher levels of management.

Therefore, it appears that the real "fighting issue" is whether Defendant could be held vicariously liable because of how the Krenzelak incident (the first slur) was handled, especially when considered in the context of what later occurred. More specifically, the issue arises as to whether the failure of McNulty and Segers to promptly send the Emrock and Vargas incidents up

the chain of command, and the repetition of similar incidents themselves, could reasonably demonstrate that the implementation of the Policy was ineffectual.

The Krenzelak episode happened in July of 2014, and McNulty knew about it just after it happened. Plaintiff has not argued that McNulty was specifically employed to deal with Title VII harassment. McNulty was not part of the HR department. To impute McNulty's knowledge of the Krenzelak incident to Defendant, Plaintiff would have to show that McNulty was sufficiently senior that he had the authority to act on Defendant's behalf to stop the harassment. It is not disputed that McNulty's title was "Field Supervisor," and that McNulty dealt with disciplinary issues and had the authority to take necessary action, such as sending Plaintiff home for the day upon request. Thus, it could be found that his knowledge of the coworker harassment can be fairly imputed to Defendant.

The question then becomes whether McNulty's actions to remedy the Krenzelak incident, and his and Segers's response to the later episodes, were sufficient as a matter of law such that the Defendant should be granted summary judgment on this claim. An employer's remedial action is adequate "if it is reasonably calculated to prevent further harassment." *Knabe v. Boury Corp.*, 114 F.3d 407, 412 n.8 (3d Cir. 1997). Thus, "[a] remedial action that stops the harassment is adequate as a matter of law." *Andreoli v. Gates*, 482 F.3d 641, 644 n.2 (3d Cir. 2007). "Typically, the timing and nature of the employer's response will dictate the adequacy of the remedial action." *Griffin v. Harrisburg Prop. Servs., Inc.*, 421 F. App'x 204, 209 (3d Cir. 2011) (citing *Andreoli*, 482 F.3d at 644).

Plaintiff points out the delay in firing Krenzelak—over 200 days passed between the incident in which Krenzelak called Plaintiff the n-word and Krenzelak being fired. Plaintiff argues that this delay necessarily shows that Defendant failed to take prompt and effective

remedial action and thus ratified Krenzelak's conduct. That timing is a relevant but not conclusive factor in assessing both the timeliness of the Defendant's final action and the effectiveness of its initial actions as to that incident. That said, it is also important to focus on McNulty's response and what came after it, since Plaintiff argues that McNulty's knowledge is imputable to Defendant.

The record facts reflect that another employee contemporaneously reported the Krenzelak incident to McNulty, and McNulty thereafter spoke to Plaintiff and Krenzelak. Plaintiff told McNulty that he was humiliated, angry, and disgusted. McNulty told Krenzelak to apologize, which he did. McNulty asked Plaintiff what he wanted him to do, and Plaintiff told him to "do what's right," and accepted McNulty's offer to leave work for the day. Plaintiff also asked to not have to work with Krenzelak. While McNulty continued to schedule them on the same job site, he did not schedule Plaintiff to work in the same truck as Krenzelak. Plaintiff was not satisfied with McNulty's response, but did not complain to Segers or HR about McNulty's handling of the incident, but McNulty also did not advise HR about it, or engage other members of management, as the Policy directed. It was not until Defendant's HR representatives later learned of the Krenzelak incident, in February of 2015, that Krenzelak was terminated.

The Third Circuit has held that an employer's remedial actions were adequate where management undertook an investigation of the employee's complaint within a day after being notified of the harassment, spoke to the alleged harasser about the allegations and the company's sexual harassment policy, and warned the harasser that the company does not tolerate any sexual comments or actions. *See Knabe v. Boury Corp.*, 114 F.3d 407 (3d Cir. 1997). A panel of the Third Circuit also concluded that an investigation of an employee's complaint, although inconclusive, was nonetheless prompt and adequate because it was "reasonably calculated to

prevent further harassment." *McCloud v. UPS*, 328 F. App'x 777, 780–81 (3d Cir. 2009) (quoting *Knabe*, 114 F.3d at 412). However, our Court of Appeals has also concluded that an employer's remedial actions were not prompt when there was a nineteen-month delay between when the employer was notified of a complaint and when it took remedial action. *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006).

As to the nature of McNulty's response to the Krenzelak episode, Plaintiff has not presented, nor has the Court identified, any caselaw holding that as a matter of law, an employer's "remedial action" must be the immediate termination of the employment of the harassing coworker. In fact, the Third Circuit has held otherwise. *See Knabe*, 114 F.3d at 414 ("[T]aking punitive action against the harassing employee, e.g., reprimand, suspension or dismissal, is not necessary to insulate the employer from liability for a hostile work environment.") Instead, in cases of nonpunitive remedies, this Court must consider "the severity and frequency of the harassment." *Id.* This "highly fact-specific inquiry" instructs that "[t]he more severe and more frequent the harassment, the less likely a nonpunitive remedy will be found adequate." *Id.*

Following this line of inquiry, another District Court in this Circuit has concluded that a manager having a conversation with a harassing coworker after a report of harassment could be sufficiently remedial. *See, e.g.*, *Kravabloski v. OM Ganesh One, Inc.*, No. 17–1306, 2019 WL 1298515 (M.D. Pa. Mar. 21, 2019). But in the Court's estimation, that is but one example of a "sufficient response" in the context of one fact-specific inquiry, and not a guidepost of universally applicable reasonableness. The Court concludes that there is a triable issue as to whether the Defendant's response to the Krenzelak episode and those that came after it were reasonable remedial actions in the context of the record here.

First, it is apparent both that the conduct of Krenzelak could be found to be "severe" by his use of a most powerful racial epithet directed to the Plaintiff and that the reprimand of Krenzelak did not end the racial harassment of the Plaintiff. While there is no evidence that Krenzelak engaged in the conduct again, it is undisputed that there were three (3) subsequent episodes involving other coworkers, and that the coworker conduct in each of them, separately or cumulatively, could rationally be found to be severe, and its repetition by distinct coworkers could readily be found to demonstrate its pervasive nature.

Second, a reasonable jury could find that had McNulty and Segers followed the Defendant's Policy and moved these events up the chain of command as they came to their attention, one or more (or perhaps all) of the subsequent episodes could have been deterred.[34] Because neither of them followed the Policy, and in fact it had not been followed initially by Segers when he learned of the second and third episodes,[35] a jury could reasonably conclude that there was a sufficient level of ineffectiveness in the implementation of the Policy such that its existence alone would not provide a safe harbor from vicarious liability. While it is true that once the Defendant's corporate level leadership became involved the sternest of actions were taken

---

[34] The Court is mindful of the instruction of our Court of Appeals that a district court is not to be in the business of substituting its judgment for that of an employer on the grounds that the employer's decision was generally unwise or even wrong, as "the question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]" *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F. 3d 639, 647 (3d Cir. 1998) (quoting *Keller v. Orix Credit Alliance, Inc.,* 130 F. 3d 1101, 1109 (3d Cir. 1997) (alteration in original)). That said, our Court of Appeals has also instructed the district courts to carefully and thoroughly consider the specific record facts that would be considered by the finder of fact to determine whether there is a genuine issue of material fact as to whether the content and implementation of the employer's anti-harassment policy was reasonably calculated to forestall or stop such workplace conduct. It is in that regard that the Court concludes that it is obligated to consider the actions taken by Defendant in order to assess whether it has demonstrated (as it must to prevail on its motion) the absence of such a material factual issue and an entitlement to judgment in its favor as a matter of law.

[35] This would permit, but not require, a jury to conclude that notwithstanding the stated seriousness of the employer in formulating and disseminating the Policy, such was not shared by frontline supervisors, calling into question whether the Policy was "reasonably calculated" in the context of this workplace to deter the conduct that occurred here.

against the involved coworkers, the Plaintiff nonetheless had to endure all along the way the repeated episodes of racial harassment that are at the center of this claim.

Third, McNulty's response to Krenzelak's use of the n-word in circumstances that a jury could reasonably conclude to have been gratuitous and almost matter-of-fact is a matter that it could take into account in assessing the effectiveness of the Defendant's response. This is particularly so given the highly offensive nature of Krenzelak's conduct, the degree to which the jury could conclude that it and the response to it reflected a workplace environment tolerant of such conduct, and what the jury might rationally conclude was a comparably low-impact response to it in the context of the stated seriousness of the Defendant's Policy.

In *Minarsky v. Susquehanna County,* 895 F.3d 303 (3d Cir. 2018), our Court of Appeals considered similar issues in the context of allegations of a sexually hostile work environment and an employer's remedial actions relative to an affirmative defense for supervisor misconduct. Of relevance here, in that case the offending supervisor had been twice reprimanded and then fired. *Minarsky*, 895 F.3d at 306. Nonetheless, given the overall factual context, the *Minarsky* Court concluded that it was up to the jury to determine "all of the facts as to whether the County 'exercised reasonable care to prevent and correct any . . . harassing behavior.'" *Id.* at 313 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).  This Court concludes that this principle applies here also.

It is a jury question as to whether the Defendant's Policy was "reasonably calculated" in its implementation to remediate the racially harassing conduct involved here. The Court reaches this conclusion by considering the full context of the workplace and the actions of the Plaintiff, his coworkers, his supervisors, and the Defendant. Lower level supervisors twice failed to follow the Policy's direction that they move the Plaintiff's complaints up the chain of command, and

there were three (3) more episodes after the Defendant's warning/"make an apology" response via McNulty to the initial Krenzelak incident. It would be reasonable for a jury to also consider whether other coworkers would have effectively been deterred from their later actions had the Krenzelak episode been dealt with more sternly as to Krenzelak and then quickly, openly, and forcefully among the workforce. *Minarsky* teaches that an employer's taking disciplinary action, even strong action including discharge, may not itself resolve the vicarious liability issue; instead, it is a question of reasonableness in light of the broader factual context. *See id.* at 311. And here, a jury could conclude that the Defendant's measures were not reasonable efforts to avoid further harm. *See id.* Further, Plaintiff's delay in identifying the perpetrators in the Emrock and Vargas episodes would not be *per se* unreasonable, *id.* at 314, and it would be but one factor that a jury would consider.

In light of the direction in *Knabe* that the Court consider these matters through the lens of a "highly fact specific inquiry," and in light of the teachings of *Minarsky,* there is sufficient record evidence such that a rational jury could conclude that the Defendant's response to the first episode (Krenzelak) was not reasonably calculated to bring the racially harassing conduct to an end. The fact that McNulty and Segers did not promptly elevate that and the following episodes to their superiors would permit a jury to rationally conclude that the Defendant had allowed the conduct to perpetuate and compound.

When there are competing reasonable inferences that a jury could rationally draw from the facts and which are material to the disposition of the involved claims and defenses, summary judgment is not appropriate, and that is the case here.

The Defendant had in place an anti-harassment policy aimed at preventing the workplace conduct that occurred here. The Defendant's ultimate responses to the coworker conduct were to

fire the employees who engaged in it, strong medicine in any workplace. And, at one juncture, the Plaintiff did himself no favors when he failed to promptly tell his frontline supervisors exactly who had engaged in that conduct, requiring the Defendant's upper leadership to ferret it out. From those things, a jury could reasonably conclude that vicarious liability for the conduct of the Plaintiff's coworkers would not apply to the Defendant.

But while the law does not impose strict liability on an employer, it does obligate it to have policies and practices in place to *effectively* prevent and stop what happened here if it is to avoid the risk of vicarious liability. The coworker misconduct was plainly race-based, directed at the Plaintiff, and could be found to be severe or pervasive or both. The reality that similar and egregious conduct occurred three (3) more times after the first episode (and the fourth time after the first three (3) coworkers had been fired), and involved the conduct of four (4) different employees over only ten (10) months, is probative evidence that the workplace environment at least tolerated that misconduct, and could tend to demonstrate that the Defendant's responses to the episodes from the beginning were not ones that  were "reasonably calculated" to bring them to an end. The employer's obligation under the prevailing law is not only to have the policy in place but to also implement it in an effective manner in the context of its own particular workplace. It has to be one that is actually structured and carried out so as to work, that is, to stop the behavior it proscribes. Here, the events as they unfolded could therefore fairly call into question the effectiveness of the Defendant's implementation of its policy from the very first episode, given how the coworker misconduct snowballed thereafter.

Considering the record as a whole, this means that one reasonable conclusion that a jury could reach is that the Defendant acted reasonably at every turn in adopting and implementing the Policy such that its actions were "reasonably calculated" to stop the racial harassment of the

Plaintiff, thereby obviating vicarious liability for coworker harassment. But it would also be reasonable for a jury to conclude that while the Defendant adopted the Policy, in the context of its own workforce environment it was not implemented so as to be "reasonably calculated" to stop such harassment. When there are conflicting reasonable inferences that could be drawn from the record facts as to such a material issue, they are to be resolved by the jury, and not by this Court.

Because the Plaintiff's coworker's racial epithets could be considered severe or pervasive, and because a reasonable jury could conclude that Plaintiff subjectively perceived his work environment to be hostile, and because it could be found to be objectively such, and because a jury could also reasonably conclude that  Defendant could be held liable for the racial harassment of the Plaintiff by his coworkers, the Defendant's motion for summary judgment on this claim will be denied.

### B.  Title VII/PHRA Retaliation Claims

Discriminatory retaliation claims under Title VII are governed by a burden-shifting framework outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff succeeds, then the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the action. *Id.* If the defendant articulates such a reason, then the plaintiff has the opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination. *Id.*

To state a *prima facie* case for retaliation under Title VII, a plaintiff must establish that (1) he engaged in protected activity; (2) the defendant took an adverse employment action

against him; and (3) there is a causal link between the protected activity and the defendant's adverse action. *See Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006). Courts evaluate PHRA retaliation claims under the same framework. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). A plaintiff may establish causation by showing temporal proximity, a pattern of antagonism, inconsistent explanations for the adverse action, or other similar circumstantial evidence that could support an inference of a causal connection between the protected activity and the adverse employment action. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000). "Whether a causal link exists 'must be considered with a careful eye to the specific facts and circumstances encountered.'" *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Farrell*, 206 F.3d at 279 n.5). A plaintiff may establish causation through "evidence gleaned from the record as a whole," and "view[ed] . . . with [a] wider lens." *Farrell*, 206 F.3d at 281.

If the plaintiff establishes a *prima facie* retaliation case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Woodson*, 109 F.3d at 920 n.2. The employer's burden at this stage is "relatively light," and it need not prove that the articulated reason actually motivated the adverse action. "At this point, the presumption of discrimination drops from the case." *Id.*

After the employer articulates a legitimate reason, the burden returns to the plaintiff to show that reason was pretextual. To prove causation at the final analytical stage of a Title VII or PHRA retaliation claim, the plaintiff must show that her protected activity was the "but-for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 362 (2013) (holding that Title VII "require[s] proof that the desire to retaliate was the but-

for cause of the challenged employment action"). Put differently, at the pretext stage, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997). The burden remains with the plaintiff. *Woodson*, 109 F.3d at 920 n.2. "[P]roof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct. . . . [I]t is not enough . . . to dis[]believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146–47 (2000) (alterations in original) (emphasis, internal quotation marks, and citations omitted).

In considering the Defendant's assertion that it is entitled to judgment in its favor as a matter of law on this claim, the Court must consider this framework, and the record evidence and numerous arguments advanced by the parties, point by point.

### i. *Prima Facie* Case

It is undisputed that Plaintiff engaged in protected activity when he complained to Segers about racial slurs in the workplace and when he filed his First and Second EEOC Charges against Defendant. It is also undisputed that Defendant terminated Plaintiff's employment on September 30, 2015, and that this was an adverse employment action. The question at this first stage of the *McDonnell Douglas* framework becomes whether the Plaintiff could at trial establish the requisite causal link between his protected conduct and the adverse employment action.

Defendant argues that Plaintiff has not established a *prima facie* case because he has not set forth facts from which a reasonable jury could conclude there was a causal connection between Plaintiff's protected activity and an action that might have dissuaded a reasonable

worker from making or supporting a discrimination charge. *See Moore*, 461 F.3d at 341–42. Plaintiff counters that during the time period between his complaints and his discharge, Defendant "engineered his termination because of his complaints." (Pl.'s Br., at 10.) The Court will consider in turn the parties' arguments in the context of the various means by which causation may be demonstrated.

### 1. Temporal Proximity

While the Third Circuit has not established a bright-line rule for the requisite temporal proximity between protected activity and disciplinary action, it has recognized that a three-month gap between the protected activity and termination is ordinarily not short enough to show an unusually suggestive temporal proximity. *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007).

Plaintiff's employment was terminated on September 30, 2015. Plaintiff first notified Segers of the racial slurs approximately nine (9) months earlier, in December of 2014. Defendant received Plaintiff's First EEOC Charge on February 19, 2015. He filed his Second EEOC Charge on March 18, 2015, approximately six (6) months before he was terminated from employment. This gap between protected activity and discharge does not suffice to create an inference of causal nexus based upon temporal proximity. *See id.* at 233 (three (3) months is not unusually suggestive); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (*superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187–89 & n.30 (3d Cir. 2019)) (two (2) months is not unusually suggestive); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (three (3) weeks is not unusually suggestive); *Farrell*, 206 F.3d at 280 (finding that temporal proximity greater than ten (10) days requires supplementary evidence of retaliatory motive).

However, the lack of suggestive timing alone does not resolve the issue, because:

> It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides [one] evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Kachmar*, 109 F.3d at 178. The Court will therefore consider whether the record nonetheless raises an inference of retaliatory discrimination.

### 2.   *Pattern of antagonism coupled with timing*

"[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Woodson*, 109 F.3d at 920–21. In order to demonstrate a "pattern of antagonism," Plaintiff must put forth evidence such as a "constant barrage of written and verbal warnings . . . and disciplinary action[s] . . . soon after plaintiff's initial complaints." *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993). A pattern of antagonism, however, is more than a series of disciplinary actions; a plaintiff must "offer [a] basis for linking the disciplinary actions to her [protected activity]." *Barton v. MHM Correctional Servs.*, Inc., 454 F. App'x 74, 79 (3d Cir. 2011) (citing *Robinson*, 982 F.2d at 895).

Ongoing antagonism may include evidence of unusually close supervision or aggressive discipline. *See, e.g., Robinson*, 982 F.2d at 895 & n.2. Plaintiff contends that Defendant exhibited a pattern of antagonism by "scrutinizing" him after receiving the First EEOC Charge in February of 2015. He cites to the fact that, within two (2) weeks of Defendant receiving the charge, Segers spoke to him about the need to arrive on time after Plaintiff showed up to work twenty-three (23) minutes late. He also cites to Segers seeking King's advice on whether to

discipline Plaintiff because Plaintiff was behind on his DOT logs. Finally, he refers to Defendant temporarily taking him off the 100/100/40 rotation schedule in March of 2015.

Management reminding Plaintiff of what time the shop opened, or Segers seeking advice on whether to discipline Plaintiff, or the changing of a schedule that HR later corrected would not in and of itself suggest the kind of scrutiny that other courts have found constituted a pattern of antagonism. Considered alone, these events would not equate to the kind of "constant barrage of written and verbal warnings" cited by the Third Circuit as sufficient to establish a pattern of antagonism, but they could be considered in the context of observations about Plaintiff and attributed to Segers when he spoke with Holland, as noted below.

Moreover, "[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014). Plaintiff was written up for a no-call, no-show in December of 2014, before engaging in any protected activity. In fact, it was in connection with that write-up that Plaintiff raised the Krenzelak incident with Segers. This negative evaluation tends to undermine Plaintiff's theory that Segers "engineered" his termination by suddenly focusing on Plaintiff's work attendance.

Nor can it fairly be said that Plaintiff was subjected to a "constant" barrage of warnings when, on March 15, 2015, he received a CAR for failing to turn in his DOT logs, but he was not disciplined again until September of 2015. Plaintiff makes much of Segers's emails to King requesting her advice on potentially disciplining Plaintiff for, *inter alia*, being behind on his logs, and for failing to fill in for someone else when told to do so. However, it appears that a jury could conclude that Segers was doing what sound workplace practices would have counseled him to do—consulting with HR before disciplining an employee who had submitted an EEOC

Charge, to ensure that he was treating him fairly. *See Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 624 (W.D. Pa. 2009) ("If anything, the references to [the plaintiff's] protected conduct [in email messages among management] indicate that some members of [the employer's] upper management were *hesitant* to discharge [the plaintiff] because of her prior charge of discrimination.").

Reading these facts in the light most favorable to Plaintiff, the record does not suggest a pattern of antagonism that in and of itself would provide the requisite inference of causation. An employer's attempts to manage an employee's pre-existing performance deficiencies after the employee has engaged in protected activity do not necessarily raise an inference of retaliatory animus. *See id.* ("While employees enjoy statutory protection from retaliation for engaging in conduct protected under the opposition and participation clauses, they are not entitled to special treatment or accommodations simply because of their protected conduct."). Thus, the record as to how the Defendant responded to what it contends was the Plaintiff's subpar workplace conduct is a relevant but not conclusive factor in the resolution of this claim.

### 3. Inconsistent Explanations

Plaintiff also suggests that allegedly inconsistent explanations from Defendant demonstrate causation. Plaintiff can meet his burden to demonstrate a causal link between the protected activities and adverse action by proffering evidence of Defendant's inconsistent explanation for terminating him. *See Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986) (explaining that the district court appropriately considered the employers' inconsistent explanations for its refusal to rehire plaintiff); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 755 (3d Cir. 1997) (considering the inconsistencies in the supervisor's testimony as to why he would not provide a reference for the former employee as evidence of retaliation).

Plaintiff argues, based on his affidavit, that King told him he was fired because he was acting like he couldn't be fired because of his EEOC Charges. However, this portion of the affidavit is plainly inconsistent with Plaintiff's prior testimony on the subject, namely that Defendant told him he was fired for insubordination, being behind on logs, attendance, and work performance. Plaintiff therefore cannot use this portion of the affidavit to create a triable issue. The record reflects that, following other disciplinary issues, Defendant terminated Plaintiff's employment after what it documented as attendance violations, and in particular, two (2) attendance violations occurring less than two (2) weeks of each other. Defendant explained this reason to him on September 30, 2015, and the next day, when he spoke to King, the Senior Director of HR. Plaintiff has not adduced any record evidence that the Defendant offered inconsistent reasons for terminating his employment.

### 4. Consideration of the record as a whole

Where temporal proximity is insufficient, and the construct of "allegations as to protected activity followed by a period of antagonism" likewise fails, causal connection may be shown when the allegations "looked at as a whole, may suffice to raise the inference." *Kachmar*, 109 F.3d at 176–77.

In *Kachmar*, the Third Circuit concluded that the plaintiff made out a *prima facie* case based on the record as a whole when she asserted that before her termination and following her protected activity, which in that case involved opposition to discrimination, her supervisor had commented in her review that "she was not on the management track" because of her "feminist campaigning," and also (following additional protected activity) management told her to look for another job. *Id.* at 178.

The Third Circuit has cautioned that in viewing the record to determine whether causation can be gleaned from it as a whole, there are "no limits on what [the Court has] been willing to consider," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000), and the Court should use a "wider lens" and consider a broad array of circumstances to show causation. *Id.* at 284. For instance, such an inference may arise when an employer gives inconsistent reasons for termination, *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986), takes a series of seemingly benign actions that paved the way for an employee's termination, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997), or attempts to provoke the employee by continually disciplining him for minor matters and miscalculating the amount of time he worked, *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993).

Viewing the facts through such a wide lens, the Defendant advances record-supported arguments that its decisions as to the Plaintiff's employment were motivated by nothing other than the Plaintiff's objective unacceptable work performance. That argument may end up carrying the day. At the same time, there are also specific circumstances in the record as discussed below that could rationally suggest the involvement of retaliatory animus in the termination decision here.

From the time that HR first learned of Plaintiff's First EEOC Charge, it promptly investigated the previous incidents, terminated the offending employees who still worked for Defendant, provided additional training to employees at the Washington shop, and encouraged Plaintiff to come forward with additional complaints or concerns about retaliation. This was not the sort of constant provocation that the Third Circuit has found to raise the specter of discrimination, and, if anything, is exactly the opposite. But viewing the record as a whole, the record would also support a finding that the Plaintiff's actions in complaining about the abusive

conduct of his coworkers, and/or that his EEOC charge filing activities, were a "but for" motivating factor in his dismissal, which would both support a jury finding of causation and a finding that the Defendant's non-discriminatory reasons were pretextual. Why that is the case is set out below when considering the record evidence as to both causation and as to "pretext."

### ii. Pretext

If the Plaintiff makes out a *prima facie* case, he would still have to show that Defendant's stated reason for terminating his employment (attendance issues) was pretextual. To establish pretext, the plaintiff must present sufficient evidence from which a reasonable jury could either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not the real reason for the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). At the pretext stage, "the factual inquiry into the alleged discriminatory motives of the employer [rises] to a new level of specificity." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998). The plaintiff must not only establish that the employer's reason was wrong, but that it was so plainly wrong that it could not have been the real reason. *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). "[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Id.* (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).

Plaintiff argues that Defendant's stated reason for firing Plaintiff—repeated attendance violations—is pretextual. He argues that the facts show that the September 19 no-call, no-show was fabricated, because he was never scheduled to work that day. He also argues that even though Plaintiff arrived to work over three (3) hours late without notifying a supervisor on

September 30, Segers had been plotting Plaintiff's discharge all along. Plaintiff points to Segers's instruction to Welty to send Plaintiff home, and Welty not giving Plaintiff the CAR, as well as Segers's communications to HR about Plaintiff being "trouble" as evidence that the tardy arrival was mere pretext for retaliating against Plaintiff for his protected complaints of discrimination. Defendant counters that Segers's attempts to manage Plaintiff's attendance issues were legitimate, and that Segers properly consulted with King out of an abundance of caution to determine whether to discipline Plaintiff.

The Defendant's attendance policy requires employees to report to work as scheduled on time, and to tell a supervisor if they will be late or absent. Moreover, District Managers, including Segers, have discretion in enforcing this policy (up to and including termination), and white employees have been written up and/or terminated for violating the attendance policy.

The record reflects that Plaintiff was disciplined for a no-call, no-show in late 2014, and was also written up for falling behind on his DOT logs in September of 2015. He then no-called/no-showed on September 19, 2015 and was at that time written up and warned that additional offenses could lead to termination. Two weeks later, he reported to work hours late, without notifying a supervisor. In deciding what form of discipline was appropriate, Segers consulted with King, who advised that termination was appropriate in light of Plaintiff's previous discipline and attendance issues. Plaintiff's employment was then terminated. That stated reason has not, contrary to Plaintiff's arguments, changed.

Nor has Plaintiff pointed more generally to other "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's stated reason for firing Plaintiff. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). To the contrary, the record reflects that as soon as Defendant learned of Plaintiff's complaints, it promptly investigated those

complaints, took remedial action (including firing employees who had used racial slurs), and encouraged him to contact HR with further problems or concerns of retaliation. When he did report a concern that he was being kept out of the field/remote job sites and therefore was not receiving overtime, he was immediately sent back into the field.

If that were all there were, then the Plaintiff would come up short as to both causation and pretext, and the Court would grant the Defendant's Motion as to this claim. But because there is more that does go to both the issues of causation and pretext, the Motion will be denied.

In these regards, Plaintiff points to Segers's statement to Danielle Holland in HR, in conjunction with two pending CARs, that Plaintiff "has been so much trouble" and that "he feels like [Plaintiff] is acting like he has a hold on them because of his past of speaking with [King]." The Defendant says that those statements were plainly connected to a discussion of Plaintiff's attendance and performance issues, and do not demonstrate that Defendant's reason for firing Plaintiff was pretextual. That may be correct. It may well be that Segers did not think Plaintiff was a satisfactory employee for any number of legitimate reasons, not the least of which was Plaintiff's inability to report for duty on time. It may be that the only thing that those comments refer to is Plaintiff's job performance and attendance issues.

Plaintiff on the other hand argues that the "trouble" that Plaintiff had caused which was referenced by Segers related to Plaintiff's complaints about the racial intolerance of his coworkers and/or his willingness to challenge workplace issues in filings with the EEOC that were protected by Title VII. And the deposition testimony of Holland is unilluminating as to which it was. (Holland Dep. 11:24–12:1 (Q: "Now, did Mr. Segers at any point explain to you why that guy [Plaintiff] was trouble? A: No, ma'am.").) While Plaintiff's construct of what

Segers was referring to is not compelled by the record, it certainly is not foreclosed by it either and it is a reasonable inference that could be drawn by a jury.

This is the type of contested issue that a jury would have to sort out at trial. If those statements are only about the legitimate performance-related subjects the Defendant posits, then the Plaintiff's retaliation claim will collapse due to a lack of causation and the absence of pretext. If, on the other hand, the jury concludes that Segers's references included his consideration of the Plaintiff's complaints to his supervisors about his coworkers' racially-charged conduct, or the fact and nature of Plaintiff's EEOC filings, then the result could be the opposite.[36] It would be up to the jury to make that decision.

But the Defendant also says, in effect, "not so fast," in that it was King, not Segers, who ultimately decided that termination of Plaintiff's employment was appropriate, thereby making the Segers statements immaterial. And King based the termination decision on the fact that "he [Plaintiff] had violated [the attendance] policy, been written up and warned, and [they] were terminable offenses." (King Dep. 61:2–14.) But the fact that King could be viewed as the ultimate and final decisionmaker as to Plaintiff's discharge does not end the inquiry. Here, the record includes facts from which a jury could also conclude that King relied on Segers's recommendations as to Plaintiff's employment, including its termination. And in such circumstances, should the jury so find, it could also assess liability on the Defendant if it concludes that the final decisionmaker's determination was influenced by the recommendations of a subordinate (here, Segers) who in turn was motivated by unlawful retaliatory animus. *See*

---

[36] And in these regards, the timing of Segers's counseling of Plaintiff for tardiness, the timing and fact of his making inquiry of King as disciplining the Plaintiff relative to his DOT logs, and then in changing Plaintiff's work schedule, could take on added significance.

*Staub v. Proctor Hosp.* 562 U.S. 411, 420 (2011); *Macknet v. Univ. of Pennsylvania,* 738 F. App'x 52, 57 (3d Cir. 2018); *Jones v. SEPTA*, 796 F. 3d 323, 330–31 (3d Cir. 2015).[37]

Viewing the facts in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the Court concludes that a jury could rationally and reasonably conclude that Segers's remarks to Holland about the Plaintiff being "so much trouble" were intended to reference either or both of the Plaintiff's complaints of coworker race-based misconduct or his EEOC Charge, that Segers viewed those matters unfavorably and that his actions toward the Plaintiff were motivated by that unfavorable viewpoint, that such considerations motivated his reports and recommendations to King, and that they actually were a "but for" causal influence of King's termination decision. *See Mason v. SEPTA*, 134 F. Supp. 3d 868, 876–77 (E.D. Pa. 2015). Of course, it is also reasonably possible that a jury would not find any one of those things to be true and that the termination of the Plaintiff's employment resulted only from his own unsatisfactory attendance and work performance. But those distinctions only serve to demonstrate that such will be questions for the jury, and not for this Court, to resolve.

In sum, because a reasonable jury could find that Defendant unlawfully retaliated against Plaintiff for engaging in protected complaints of racial harassment and/or the filing of his EEOC Charges, Defendant's motion for summary judgment on Plaintiff's Title VII and parallel PHRA retaliation claims will be denied.

---

[37] While Plaintiff expressly raised this argument based on what is referred to as the "cat's paw" theory of liability explored in *Staub*, ECF No. 117 at 15–16, the Defendant did not respond to that argument in its reply brief. (*See* ECF No. 121.)

**IV.**    <u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied.

An appropriate Order will follow.

 s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  November 30, 2020

cc:    All counsel of record